Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



ELIAS DELGADO,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-01-00428-CR

Appeal from the

Criminal District Court No. Five

of Dallas County, Texas

(TC# F-0054953-NL)




O P I N I O N

           On February 25, 2004, this Court issued an opinion which overruled all four of
Appellant’s issues and affirmed Appellant’s murder conviction. On October 6, 2004, the
Court of Criminal Appeals issued an opinion vacating this Court’s opinion and remanding
the cause to this Court. The Court of Criminal Appeals noted that the United States Supreme
Court’s decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177
(2004) had issued after the issuance of this Court’s opinion. The Court of Criminal Appeals
directed this Court to review our holding that a statement made by an individual to a police
officer responding to the scene of the offense was admissible. We are to review our holding
in light of the holding in Crawford that testimonial statements made to police during
interrogation are inadmissible under the Confrontation Clause notwithstanding prior holdings
regarding exceptions to the rule on hearsay.


 We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
           On October 19, 2000, Maria Pab’on, a 911 operator, received a call about an incident
at 4109 Avondale in Dallas, Texas. The caller identified himself as Manuel Carrillo and he
stated that he wanted to speak in Spanish. After seeking and obtaining assurances that he
would not be deported, Carrillo stated that his roommate was soliciting his help to kill an
individual named Elvis Gomez. Pab’on testified that Carrillo was very excited and he
seemed afraid. During a second call to inquire why the police had not arrived, Carrillo stated
that he was nervous.
           Dallas police officer Jay Angelino stated that he received Pab’on’s dispatch and he
responded to the address. He was met by a man who identified himself as Manuel Carrillo. 
He was very excited and the officer had to calm him down. Carrillo stated that he had called
911 twice. He told Officer Angelino in English that his roommate, Elias Delgado, was going
to kill his ex-lover’s new boyfriend to win the ex-boyfriend back. This was to occur in the
bathroom of their apartment. After a backup officer arrived, Carrillo took both officers to
the apartment and they knocked on the door. Appellant asked who was at the door and they
responded that they were police. Appellant told them to wait a minute. After five minutes,
Appellant opened the door. He was shirtless, and his only visible hand was bleeding. He had
red welts on his body which led Officer Angelino to believe there had been a fight. 
Appellant stated that the officers could not enter until he had spoken to his lawyer. As
Officer Angelino thought that Appellant might have a weapon because he would not show
his other hand, he kicked the door open.
           Officer Angelino left Appellant with the backup officer and he went into Appellant’s
bathroom. A shower curtain was drawn around the bathtub, and a foot clad in a tennis shoe
was hanging outside the curtain. The officer noticed blood on the floor and he saw the dead
body of an individual in the tub.
           Forrest Smith testified that he was a detective with the Physical Evidence Section of
the Dallas Police Department. Smith took a number of photographs at the crime scene. 
These photographs depicted a dead individual in the bathtub with cuts on his hands. There
was signs drawn in shoe polish on the bathtub. Smith stated that the signs appeared to be
associated with a mystical religion practiced by some in the Hispanic community. A
“Wyoming” brand hacksaw and a pair of rubber gloves were found near the body. Also, an
extra blade for the hacksaw was found in the bathroom sink. A container of ammonia
cleaner was near the body. There were blood stains around the bathroom sink and a buck
knife was found in the sink. Shoe polish, candles, a bag of soil, and a roll of duct tape were
found in portions of the apartment. The decedent’s school identification card and passport,
both showing the name and photograph of Elvis Gomez were found in the apartment.
           In Appellant’s bedroom, there were several cut lengths of duct tape which were
positioned on a chair. There were also five cut strands of string on another chair. A deck of
tarot cards and heavy duty garbage bags used for contractor clean up were found in the living
room. There were credit card receipts in the apartment indicating that Appellant’s American
Express credit card was used to purchase from Outdoor World a sportsman’s knife and a
“Wyoming” hacksaw. Both were dated October 18, 2000. There was also a receipt from the
same credit card showing a purchase from Home Depot, dated October 19, 2000, for garbage
bags. Detective Smith testified that Appellant’s fingerprints were found on the shoe polish
kit and on the outside packaging of the hacksaw.
           The medical examiner, Dr. Jill Urban, stated that the decedent, Elvis Gomez, died as
a result of a deep stab wound which severed his jugular vein and his carotid artery; thereby
causing him to bleed to death. The deceased had blunt force injuries on his shoulder and he
had sustained twenty-three incised wounds to his neck, cheeks, lip, fingers, and hands. The
witness characterized the cuts on the fingers and hands as being consistent with defensive
wounds. She stated that the fatal injuries on the decedent could have been made by the knife
that was admitted into evidence. On cross-examination, the medical examiner stated that it
was possible that the decedent could have been originally holding the knife with which he
was stabbed and he suffered the incised wounds during a struggle for the knife or he could
have suffered the wounds from existent broken glass. She also indicated that it would not
have required a great deal of force to inflict the fatal wound.
           Dallas Police Department Detective Rick Berry testified that he arrived on the scene
at 3:10 p.m. Detective Berry stated that Manuel Carrillo was in an excited state at that time. 
He stated that Carrillo was an illegal alien and the detective believed that Carrillo was in
Mexico at the time of trial. As a result of his inspection of the apartment, the detective
determined that a struggle had occurred in the bathroom. The knife in the sink has been
placed under running water. Detective Berry opined that the markings in the bathroom were
associated with Satanism. He did not see any marks or scratches on Appellant’s body. 
However, the witness stated that the wounds on Appellant’s hands were consistent with the
type of wounds that occur where a knife-wielding assailant’s hand slips on the knife as it is
thrust into the victim. On the other hand, the decedent’s hand wounds appeared to be
defensive wounds usually inflicted when a victim tries to ward off a knife attack. It was the
detective’s opinion, based upon his viewing of the crime scene, that Appellant killed the
decedent and had planned to dismember his corpse and haul the body away in construction-weight garbage bags.
           Detective Berry interviewed an individual named Steven Long approximately a week
after the offense occurred. Long stated to the detective that Appellant was very jealous and
angry about Long’s relationship with the decedent. About a month prior to the killing, Long
and Appellant had what Long characterized as a romantic dinner and during the dinner,
Appellant stated to Long that the decedent was using Long as a toy.
           Steven Long, a disbarred attorney, testified during the defense portion of the trial. He
stated that the decedent, a citizen of Panama, had been living in the country illegally. Long
was the decedent’s homosexual boyfriend. Long had a sexual relationship with Appellant
which ended when Long began a relationship with the decedent. Long testified that
Appellant and the decedent got along well together although the decedent was at one time
jealous of Long’s continued friendship with Appellant. The decedent once threatened to kill
Appellant if he found out that Long and Appellant had resumed their sexual affair. The
decedent also worried that Long and Appellant were conspiring to have him deported back
to Panama. Long testified that Manuel Carrillo was a self-described witch who used to draw
witchcraft symbols that were similar to the drawings on the side of the bathtub.
           Long testified that when he told Appellant that he was in love with the decedent,
Appellant responded that it would be difficult for him to accept. Appellant had stated in
various communications that he loved Long and complained of their sexless relationship. 
The witness stated that when he was interviewed by Detective Berry, he thought it was clear
that Appellant had plotted to kill the decedent. However, at trial he took the position that the
decedent had an aggressive nature and that Appellant would only have killed the decedent
in self-defense.
           After the defense presented the testimony of several character witnesses who stated
Appellant was not a violent person, Appellant testified in his own behalf. Appellant testified
that he had allowed his roommate, Manuel Carrillo, to purchase the buck knife and the saw
found in the apartment with his credit card. Appellant stated that he was a devout Catholic
and it was Carrillo who explored mystical religions.
           Appellant testified that on the afternoon of the killing, he had taken the decedent to
a Kroger store in order to pay an electric bill, and then the two had lunch. They later returned
to Appellant’s apartment for the decedent to retrieve some of his property that was at the
apartment. As they arrived, Carrillo was smoking outside of the apartment. The decedent
proceeded to use Appellant’s computer in the bedroom. Later, when Appellant went into the
bedroom, the decedent pushed him onto the bed and a struggle ensued. At some point, the
decedent pushed Appellant into the bathroom where the decedent grabbed the knife and a
struggle ensued for control of the knife. As they fought, they fell into the bathtub. Appellant
testified that the decedent was killed in self-defense and he had no intention to kill the
decedent.
II. DISCUSSION
           In Issue No. Two, Appellant contends that the court erred in admitting a statement
made to the police officer who responded to the scene. We review a trial court’s decision to
admit evidence over objection under an abuse of discretion standard and will not reverse that
decision absent a clear abuse of discretion. Apolinar v. State, 155 S.W.3d 184, 186 (Tex.
Crim. App. 2005). The trial court abuses its discretion when the decision lies outside the
zone of reasonable disagreement. Id. In deciding the constitutional issue presented, we
review the trial court’s ruling de novo. Muttoni v. State, 25 S.W.3d 300, 304 (Tex. App.--Austin 2000, no pet.).
           We will first consider if Carrillo’s statements to Officer Angelino constituted excited
utterances. Hearsay is a statement, other than one made by the declarant while testifying at
a trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid.
801(d). For hearsay to be admissible, it must fit into an exception provided by a statute or
the rules of evidence. Tex. R. Evid. 802. One such exception is that for excited utterances. 
Tex. R. Evid. 803(2). An excited utterance is “a statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by the event
or condition.” Id.; Salazar v. State, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). In
determining whether a hearsay statement is admissible as an excited utterance, the ultimate
inquiry is “whether the declarant was still dominated by the emotions, excitement, fear, or
pain of the event or condition” when the statement was made. Apolinar, 155 S.W.3d at
186-87. The court may consider factors such as “the length of time between the occurrence
and the statement, the nature of the declarant, whether the statement is made in response to
a question, and whether the statement is self-serving.” Id. at 187. However, no single factor
is dispositive, but merely bears on our ultimate determination. See Lawton v. State, 913
S.W.2d 542, 553 (Tex. Crim. App. 1995); Penry v. State, 903 S.W.2d 715, 750-51 (Tex.
Crim. App. 1995).
           In the present case, Carrillo identified himself but had to be calmed down before he
could continue. The testimony indicates that he believed a murder was occurring or about
to occur. We find that the court did not abuse its discretion in admitting the statements to
Officer Angelino on the ground that it was an excited utterance.
           Regarding the confrontation issue, the United States Supreme Court has handed down
its decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177
(2004), which held that without exception, testimonial hearsay statements of witnesses absent
from trial are admissible over a Sixth Amendment Confrontation Clause objection only
where the declarant is unavailable and where the defendant has had a prior opportunity to
cross-examine the declarant. Id. at 57-60, 124 S.Ct. at 1368-69. Testimonial statements
include police interrogations and “prior testimony at a preliminary hearing, before a grand
jury, or at a former trial.” Id. at 68, 124 S.Ct. at 1374. These statements are testimonial
because they are “ex parte in-court testimony or its functional equivalent--that is, material
such as affidavits, custodial examinations, prior testimony that the defendant was unable to
cross-examine, or similar pretrial statements that declarants would reasonably expect to be
used prosecutorially, . . . extrajudicial statements . . . contained in formalized testimonial
materials, such as affidavits, depositions, prior testimony, or confessions, . . . statements that
were made under circumstances which would lead an objective witness reasonably to believe
that the statement would be available for use at a later trial.” Id. at 51-52, 124 S.Ct. at 1364. 
See Wiggins v. State, 152 S.W.3d 656, 659 (Tex. App.--Texarkana 2004, pet. ref’d) (stating
that testimonial statements “all involve a declarant’s knowing responses to structured
questioning in an investigative environment or a courtroom setting where the declarant would
reasonably expect that his or her responses might be used in future judicial proceedings”).
           Statements made to officers responding to a call during the initial assessment and
securing of a crime scene are not testimonial. See Spencer v. State, 162 S.W.3d 877, 880
(Tex. App.--Houston [14th Dist.] 2005, pet. filed); see also Key v. State, --- S.W.3d ----, ----,
2005 WL 467167, at *3-5 (Tex. App.--Tyler Feb.28, 2005, pet. ref’d). Here, it was clearly
the case that the statements were made during just such a situation. Appellant maintains that
Carrillo’s inquiries concerning his immigration status indicate that he was cognizant that his
statements might be used in a future judicial proceeding. However, in this instance we find
that Carrillo had been assured that there were no immigration implications by the 911
operator. Further, under the facts in this case, the predominating impulse to give the
statements was the fact of the impending murder. We find no abuse of discretion in
admitting the statements under the Crawford holding.
           Furthermore, we find that any error was harmless. A Confrontation Clause violation
is subject to a harmless error analysis. Mendez v. State, 56 S.W.3d 880, 893 (Tex. App.--Austin 2001, pet. ref’d). We are required to reverse the conviction when Confrontation
Clause error is presented unless we can determine beyond a reasonable doubt that the error
did not contribute to the conviction. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct.
824, 828, 17 L.Ed.2d 705 (1967); Mendez, 56 S.W.3d at 893; see also Tex. R. App. P.
44.2(a). In Shelby v. State, 819 S.W.2d 544, 547 (Tex. Crim. App. 1991), the Court of
Criminal Appeals adopted the Supreme Court’s analysis in Delaware v. Van Arsdall, 475
U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), for assessing harm in
Confrontation Clause cases. See also De la Rosa v. State, 961 S.W.2d 495, 499 (Tex. App.--San Antonio 1997, no pet.). The Van Arsdall analysis is a three-pronged test. First, the
reviewing court must assume that the damaging potential of the cross-examination was fully
realized. Second, with that assumption in mind, the court must review the error in
connection with the following factors: the extent for cross-examination otherwise permitted;
the importance of the witness’s testimony in the State’s case; whether the testimony was
cumulative; the presence or absence of evidence corroborating or contradicting material
points of the witness’s testimony; and the overall strength of the State’s case. Finally, in light
of the first two prongs, the court determines if the error was harmless beyond a reasonable
doubt. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438; see also Shelby, 819 S.W.2d at 547.
           The State presented a strong case which indicated that Appellant had planned to
murder the decedent. Articles intended to dispose of the body were purchased with
Appellant’s credit card. There was substantial evidence that Appellant was disturbed and felt
excluded by the relationship between Long and the decedent. While the medical examiner
indicated that it was possible that the wound in Appellant’s hand resulted from him grabbing
the knife away, Detective Berry unequivocally denied that could have been the case. Long
had initially indicated to Detective Berry that he thought Appellant had murdered the
decedent albeit he changed his view at trial. This prior statement tended to provide
corroboration to the facts alleged in Carrillo’s statement. We find beyond a reasonable doubt
that the error, if any, was harmless beyond a reasonable doubt. Issue No. Two is overruled.
           Insofar as the opinion of the Texas Court of Criminal Appeals remanded this cause
specifically referencing only the alleged hearsay statement made to a responding officer, we
have confined all discussions to Issue No. Two. Issue No. Two is overruled in its entirety
and we affirm the judgment of the trial court.
 
                                                                  RICHARD BARAJAS, Chief Justice

November 3, 2005

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)